1

Robert R. Berk, Bar #010162
Charles M. Callahan, Bar #014984

2

JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800

3

Phoenix, Arizona  85012
Telephone:  (602) 263-1700

4

Fax:  (602) 200-7818
rberk@jshfirm.com

5

ccallahan@jshfirm.com

6

Attorneys for Plaintiff ARCP

7

OF COUNSEL

8

Kevin J. O'Connor
Christopher T. Hynes

9

HINCKLEY, ALLEN & SNYDER LLP
28 State Street

10

Boston, MA  02109
(617) 345-9000

11

koconnor@hinckleyallen.com
chynes@hinckleyallen.com

12

13

**UNITED STATES DISTRICT COURT**

14

**DISTRICT OF ARIZONA**

15

American Realty Capital Properties, Inc.,

NO.

16

Plaintiff,

**COMPLAINT**

17

v.

**(Jury Trial Demanded on All Counts So Triable)**

18

Jeffrey C. Holland; and The Carlyle Group, LP

19

Defendants.

20

21

**INTRODUCTION**

22

23

This case involves claims for breach of contract, tortious interference with

24

contractual relations, and fraudulent inducement.  From December 2010 until February 5,

25

2014, Defendant Jeffrey C. Holland ("Holland") was employed as a highly-compensated,

26

senior executive with Cole Real Estate Investments, Inc. ("Cole").  His primary

27

responsibility during that time was to build and expand upon the "distribution network"

for shares in real estate investment trusts ("REIT") sponsored and managed by Cole.  He

28

3601438.1

1  did so – in return for more than $10 million of compensation, and tens of millions of

2  dollars of support, from Cole – primarily by cultivating relationships with, securing

3  investment capital commitments from, independent financial advisors, who represent

4  clients through organizations such ING, AIG, LPL Financial, Lincoln Financial, and

5  Ameriprise, and other financial advisors, wire houses and similar organizations.

6      On February 7, 2014, Cole was acquired by Plaintiff American Realty Capital

7  Properties, Inc. ("ARCP").  Shortly before the closing of the transaction, Holland falsely

8  represented to ARCP that he had decided to "take some time off" rather than join ARCP

9  and had no intention of joining another company in the foreseeable future.  Based on those

10 knowingly false representations, Holland induced ARCP to treat his departure from the

11 company as a termination without cause in the wake of a change of control, which entitled

12 him to $7.1 million in severance pay and stock.  In connection with that fraudulent

13 inducement, Holland agreed to work as a part-time consultant for ARCP (no more than 50

14 hours per *month*) for 6 months for an additional $100,000.

15     As conditions of both his employment at Cole and his consulting agreement with

16 ARCP, Holland committed in writing to at least two post-employment covenants that he is

17 now violating.  For one, he expressly agreed that he would not solicit any of the financial

18 advisors whose clients have invested in Cole or ARCP funds for 12 months after

19 terminating his relationship with Cole and ARCP.  Second, he committed that he would

20 not – at any time – use or disclose any Confidential Information he learned through his

21 relationship with Cole and ARCP.

22     Less than two weeks ago, ARCP learned that Defendant The Carlyle Group, L.P.

23 ("Carlyle") has hired Holland for the purpose of having him solicit independent financial

24 advisors and persuade them to have their clients invest in investment funds managed and

25 promoted by Carlyle.  Given the breadth of distribution networks of ARCP and Cole,

26 Holland will inevitably exploit both the goodwill that he developed with independent

27 financial advisors across the country at ARCP's expense, and Confidential Information

28 about which independent financial advisory firms, and which individual financial

1    advisors, are most likely to sell "alternative investments" such as those offered by ARCP

2    or Carlyle.

3         Despite due demand by ARCP, the Defendants have failed and refused to confirm

4    that Holland will not call upon any of the independent financial advisory firms that he

5    called upon on behalf of Cole, and that he will not use or disclose any Confidential

6    Information he learned as a Cole senior executive.   Accordingly, ARCP respectfully

7    requests both preliminary and permanent injunctions

8         • barring Holland from using or disclosing any Confidential Information he

9              learned while employed by Cole (which is defined in the written

10             agreements), and, until August 5, 2015, from soliciting any investors, and

11             any financial advisory firms and individual financial advisors whose clients

12             are investors in ARCP or any of the funds it manages; and

13        • barring Carlyle from further interfering with ARCP's rights under the

14             relevant written agreements.

15        In addition, ARCP seeks money damages in an amount to be determined at trial,

16   return of the $7.1 million in severance payments and stock he received from ARCP

17   through his fraudulent inducement, pre- and post-judgment interest, and all other relief

18   deemed appropriate by the Court.

19        In support of this Complaint, ARCP alleges the following facts based on personal

20   knowledge as to facts regarding its actions, and on information and belief as to that of

21   others.

22                              **THE PARTIES**

23        1.    ARCP is a corporation organized under the laws of the State of Maryland,

24   with a principal place of business at 405 Park Avenue in New York, New York.

25        2.    Holland is a resident of the State of Arizona, with a primary residence at

26   3420 Stanford Drive in Paradise Valley, Arizona.

27

28

3601438.1                              3

1    3.    Carlyle is a limited partnership organized under the laws of the State of

2    Delaware, with its principal place of business located at 1001 Pennsylvania Avenue, Suite

3    220 South, in Washington, DC.

4    **JURISDICTION AND VENUE**

5    4.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §

6    1332 because there is complete diversity of citizenship between the parties and the

7    amount in controversy, exclusive of interest and costs, exceeds $75,000.

8    5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because

9    Holland is domiciled in the State of Arizona and subject to this Court's personal

10   jurisdiction.

11   6.    This Court has personal jurisdiction over Carlyle pursuant to the Arizona

12   long-arm statute, Ariz. R. Civ. P. 4.2, because: (i) Carlyle purposefully availed itself of

13   the privilege of conducting business in the State of Arizona by entering into a business

14   agreement with an individual who resides in the State of Arizona; (ii) the claims set forth

15   in this action arise out of Carlyle's contacts with Arizona; and (iii) the exercise of

16   jurisdiction is reasonable.

17   **FACTUAL BACKGROUND**

18   7.    ARCP is a publicly-traded real estate investment trust ("REIT").  Its shares

19   trade on the NASDAQ Global Select Market.

20   8.    In general terms, a REIT is a fund that pools assets of shareholders to invest

21   in real estate.  Among other attributes, REITs provide investors with more diversity than

22   single property real estate investments, as well as professional management of the

23   properties owned by the REIT, and certain tax advantages.

24   9.    In addition to the activities of a typical REIT, ARCP also markets and

25   manages the assets of other REITs.  The REITs for which ARCP provides asset-

26   management services are "non-traded REITs," meaning that those REITs, unlike ARCP,

27   are not traded on a public securities exchange.  The other REITs ARCP currently manages

28   include the following:  Cole Credit Property Trust, Inc.; Cole Credit Property Trust IV,

1    Inc.; Cole Credit Property Trust V, Inc.; Cole Corporate Income Trust, Inc.; Cole Office

2    & Industrial REIT (CCIT II), Inc.; and Cole Real Estate Income Strategy (Daily NAV),

3    Inc.

4         10.    ARCP focuses on owning and managing – for itself and the non-traded

5    REITs that it markets and manages – multi-tenant and single-tenant commercial properties

6    that offer primarily "net leases" to "high credit quality" tenants.

7              a.  A "commercial property" is a building used for a tenant's business

8                  operations.

9              b.  A "net lease" is a lease that requires the tenant to pay for all utilities,

10                 maintenance and taxes.  Thus, ARCP's tenants pay ARCP monthly rent, but

11                 generally are responsible for all other expenses associated with the ongoing

12                 use and operation of the properties they lease from ARCP.

13             c.  The term "high credit quality" tenant refers to tenants that have strong credit

14                 ratings.

15        11.    In simple terms, ARCP buys, sells, owns and manages commercial

16   buildings that it rents to stable, "blue chip" companies, such as Walgreens, FedEx,

17   General Electric and Goodyear.

18        12.    ARCP's investment strategy is designed to generate monthly dividends for its

19   shareholders from steady, monthly rents paid by high-quality tenants and property management fees,

20   while still offering significant "growth" potential primarily because of contractual rent increases and

21   the opportunity for its commercial real estate properties to increase in value.

22   *Alternative Investments*

23        13.    In the financial world, there are four major categories of investments:  (i)

24   stocks; (ii) bonds; (iii) cash; and (iv) "alternative" investments.

25        14.    Alternative investments include, among other types of investments, tangible

26   assets such as real estate and commodities, as well as financial assets such as REITs,

27   hedge funds and shares in venture capital and private equity funds, and specifically, non-

28

1    traded illiquid direct investment programs, including non-traded REITs like those

2    managed by ARCP.

3        15.    Many financial advisors recommend that their clients invest a minority

4    percentage of their portfolios in alternative investments in order to generate investment

5    income and as a hedge against the volatility of the stock and bond markets.

6    ***Marketing Through Independent Financial Advisors***

7        16.    ARCP markets its shares and the shares of the non-traded REITs it manages

8    through independent financial advisors.  For example, the vast majority of ARCP's shares

9    and the shares of the non-traded REITs that ARCP manages and markets, are purchased

10   by investors advised by major financial-service firms such as LPL Financial, AIG,

11   Lincoln Financial, ING and Ameriprise.

12       17.    Thus, the most important marketing channels for ARCP's shares, and the

13   shares of the non-traded REITs that ARCP markets and manages, are independent

14   financial advisor channels associated with major financial services firms, such as those

15   described above.

16       18.    Accordingly, ARCP focuses most of its marketing resources upon – and

17   continuously monitors the investment activity of – independent financial advisory firms

18   and their individual advisors.  Its most significant and direct competition for the

19   investment dollars guided by those investment advisors comes from other financial

20   services firms that market and sell alternative investments through independent financial

21   advisors, such as Carlyle.  ARCP spends tens of millions of dollars each year, and

22   countless hours, working continuously to refine and expand its distribution network for its

23   products, including, among other efforts, by identifying the financial advisors whose

24   clients are most likely to invest in alternative investments, and cultivating relationships

25   and goodwill with them.

26

27

28

3601438.1                                          6

1     *ARCP's Acquisition of Cole*

2         19.    On February 7, 2014, ARCP acquired Cole Real Estate Investment, Inc.

3 ("Cole") in a transaction in which Cole merged with and into a wholly-owned subsidiary

4 of ARCP.

5         20.    Like ARCP, Cole was a REIT that owned and operated commercial,

6 primarily net lease properties. In addition, Cole owned, and as a result of the merger,

7 ARCP owns, Cole's private capital management business, which contributed substantially

8 to the overall value of Cole, and together with the pre-merger private capital management

9 business of ARCP, contributes substantially to the overall value of ARCP.

10     *Holland's Position and Duties at Cole*

11         21.    Prior to ARCP's acquisition of Cole, Holland worked for Cole. He joined

12 Cole in December 2010 as its Executive Vice President and Head of Capital Markets.

13 Holland's primary responsibility as an EVP and Head of Capital Markets for Cole was to

14 direct Cole's marketing and sale of its shares, and those of the other non-traded REITs

15 that it managed – the same non-traded REITs now managed by ARCP – primarily through

16 independent financial advisors. In connection with that responsibility, Holland had

17 continuous access to highly confidential information about which offices of each and

18 every independent financial advisory firm, and which individual financial advisors within

19 each office, most actively invested in Cole's offerings – and those of other firms offering

20 alternative investments – on behalf of their clients. Cole protected that confidential

21 information through, among other means, non-disclosure covenants with its employees.

22         22.    Holland's duties as EVP and Head of Capital Markets at Cole also included

23 continuous cultivation and maintenance of relationships with individual financial advisors

24 and key executives and managers at independent financial advisory firms, in order to

25 encourage them to direct appropriate clients to Cole's alternative investment offerings.

26 He regularly traveled across the country to conduct meetings for that purpose on behalf of

27 Cole.

28

3601438.1                          7

1    23.    During Holland's Cole employment, Cole invested tens of millions of

2    dollars helping him build goodwill with, and comprehensive knowledge about,

3    independent financial advisors, as well as other financial advisors, wire houses and similar

4    organizations across the country.  In acquiring Cole, ARCP hoped and expected that it

5    would derive the benefits of that massive investment.

6    24.    Notably, before joining Cole, Holland had never worked for a firm like

7    ARCP or Cole that focuses exclusively on real estate investment and management.

8    Attached hereto as Exhibit A is a page from "LinkedIn" that describes Holland's

9    professional background.  On that page, Holland holds himself out as a "financial services

10   executive with expertise in strategy, *distribution*, product and *platform development*."

11   (Italics added.)

12   25.    The terms "distribution" and "platform development" refer in the financial

13   services industry primarily to the marketing and sale of products to retail investors

14   through investment advisors.

15   26.    In connection with a reorganization of Cole and certain affiliated entities,

16   Holland was promoted on June 18, 2013, to President and COO of Cole.  In that position,

17   he continued to have access to highly confidential information about which offices of each

18   and every independent financial advisory firm, and which individual financial advisors

19   within each office, most actively invested in Cole's offerings on behalf of their clients.

20   He also continued to travel across the country in an effort to cultivate and maintain

21   relationships with key executives and managers at independent financial advisory firms,

22   as well as individual financial advisors, in order to encourage them to direct appropriate

23   clients to Cole's alternative investment offerings.  In addition, Holland worked to build

24   relationships with other financial advisors and similar organizations in order to further

25   develop Cole's platform and expand its distribution network.

26

27

28

3601438.1                                        8

*The Relevant Written Agreements*

27.     As a condition of his promotion to the position of President and COO of Cole, Holland executed a written Employment Agreement containing, among other terms and conditions, the following restrictive covenants:

a.  ***Prohibition Against Use of Cole's Confidential Information****:* Section 7(a) of Holland's Employment Agreement prohibits Holland from "us[ing]" or "divulge[ing], whether "directly or indirectly," any of Cole's "Confidential Information." The term "Confidential Information" is defined in the Employment Agreement to include, without limitation, "names, lists and other information relating to customers, … retailers, … strategy and business plans, tactics, sales forecasts, sales reports and other sales materials, … marketing and development plans, [and] marketing techniques and materials…."

b.  ***Non-Solicitation of Clients and Investors***: Section 8(c) of Holland's Employment Agreement bars him, for 12 months after termination of his Cole employment, from soliciting any person or entity who serves as a representative of investors in connection with the investments in any [Cole or Cole affiliate] Fund Vehicle or who is otherwise engaged in raising capital or other financing for any such Fund Vehicle[.]" A true copy of Holland's Employment Agreement with Cole is attached hereto as Exhibit B.

28.     Holland's Employment Agreement with Cole is governed by the laws of the State of Maryland, without regard to its conflicts of laws principles, see Ex. B at § 14(a), and inures to the benefit of ARCP as Cole's successor, see id. at § 9.

29.     Holland was highly compensated for his work as President and COO of Cole. His annual base salary was $450,000, with a "Target Bonus" for 2013 of $808,000 (which he in fact received). He also received "variable commissions" tied to his success "in overseeing the private capital raising business of the Company[,]" health and other

1   benefits, and was "entitled to an award of $2,525,000 worth of stock in Cole within 22

2   days of Cole's stock being listed on any national securities exchange."

3        30.   In October of 2013, Cole agreed to be acquired by ARCP. As discussed

4   above, the transaction closed on February 7, 2014.

5        31.   Because ARCP is publicly traded on the NASDAQ Global Select Market,

6   the acquisition triggered Holland's right to an award of $2,525,000 worth of ARCP stock,

7   which he received in early March.

8        32.   ARCP acquired Cole with the expectation that Holland would remain as a

9   senior executive of the merged entity. Shortly before the transaction closed on February

10  7, 2014, however, Holland advised ARCP that he did not wish to do so. He stated that he

11  wanted to take some time off from work and had no plans to join another company. At

12  his request, and in reliance upon that knowingly false representation, ARCP agreed to

13  treat Holland's departure from Cole as termination "without cause" under his

14  Employment Agreement, which entitled him to a $5.4 million severance payment. Based

15  on his knowingly false representations, ARCP also signed a written agreement with

16  Holland pursuant to which he agreed to serve as a part-time consultant (up to 50 hours per

17  month) for six months (the "Consulting/Covenants Agreement") for an additional

18  $100,000. A true copy of Consulting/Covenants Agreement is attached hereto as Exhibit

19  C.

20       33.   The Consulting/Covenants Agreement includes as an attachment, and

21  expressly incorporates by reference, a "Company Services Covenants Agreement" (the

22  "Covenants Agreement"). See Exhibit C.

23       34.   The Consulting/Covenants Agreement, which is governed by Arizona law,

24  contains the *exact same* Confidentiality and Non-Solicitation covenants that are in the

25  Employment Agreement and quoted in relevant part in ¶ 27(a) and (b), above. See id. at §

26  1(a) and (d) and § 2(c).

27       35.   Both the Employment Agreement and the Consulting/Covenants Agreement

28  also contain an express acknowledgement by Holland that "the remedy at law for breach

3601438.1                                    10

1    of the provisions of this Agreement may be inadequate and that, in addition to any other

2    remedy [Cole/ARCP] may have, it shall be entitled to an injunction restraining any breach

3    or threatened breach, without any bond or security to be provided and without the

4    necessity of showing actual damages." See Exhibit B at § 8(d) and Exhibit C at § 2(d).

5        36.    Holland has never raised any concerns to Cole or ARCP about the validity

6    of his Employment Agreement or Cole's compliance with all material terms of that

7    agreement.  The same is true with respect to the Consulting/Covenants Agreement he

8    entered into with ARCP.  Cole and ARCP have complied fully with all material terms of

9    all of their agreements with Holland.

10   ***Holland Breaches The Agreements***

11       37.    Last week, to the considerable surprise of ARCP's senior executive team,

12   ARCP received a letter from Lori Sabet, Managing Director/Global Human Resources for

13   Carlyle notifying ARCP that Holland has gone to work for an unspecified affiliate of

14   Carlyle "to direct and oversee the high net worth/retail business team responsible for

15   fundraising for Carlyle's 'Global Market Strategies' and 'Solutions' business segments."

16   A true copy of Ms. Sabet's letter, which is dated March 21, 2014, is attached hereto as

17   Exhibit D.

18       38.    According to Ms. Sabet's letter, "Carlyle is one of the world's largest and

19   most diversified multi-product global alternative asset management firms."  See Exhibit

20   D.

21       39.    In an appendix to the letter, Carlyle describes Holland's duties in his new

22   position as follows:

23   [D]irecting and overseeing the high net worth/retail business team
responsible for (i) ***building the distribution channel to identify, cultivate***
24   ***relationships with, and secure investment capital commitments through***
wire houses, ***independent financial advisors, regional financial advisors,***
25   ***and other similar organizations that represent, current and prospective***
***accredited high net worth investors and non-accredited mass affluent***
26   ***investors for the purpose of funding investments made or proposed to be***
***made by Carlyle investment products*** within Carlyle's Global Market
27   Strategies and Solutions business segments; (ii) ***developing a marketing***
***plans [sic] for building out this investor base***, (iii) designing and leading
28   the execution of investor reporting for these channels and investors, [and]

3601438.1                                           11

(iv) ***closing on required platform agreements*** including helping to structure terms and negotiating documentation…. See Exhibit D (emphasis added).

40.     The duties described above are exactly the same duties that Holland performed at Cole in his positions as EVP, President and COO.

41.     In response, on March 24, 2014, ARCP Executive Vice President and General Counsel, Richard A. Silfen, faxed a letter to Ms. Sabet and Carlyle notifying them that "Carlyle's employment of Mr. Holland will result in a direct breach of certain covenants in the [Employment Agreement and the Consulting/Covenants Agreement]."  A true copy of Mr. Silfen's March 24, 2014 letter to Ms. Sabet is attached hereto as Exhibit E.

42.     The following day, March 25, 2014, Mr. Silfen sent another letter to the same effect by email and overnight delivery to Holland.

43.     Neither Holland, Ms. Sabet, nor anyone else acting on behalf of Holland or Carlyle, has responded to Mr. Silfen's letters.

***Irreparable Harm to ARCP***

44.     Unless the Defendants are immediately enjoined from using Confidential Information Holland learned during his three years at Cole, and he is enjoined from soliciting any customers or independent investment advisors whose clients invest in ARCP or any of the funds it manages, ARCP will suffer harm that cannot be fully quantified and cannot be fully remedied by an award of money damages.  As the Cole employee in charge of promoting and marketing its funds to independent financial advisory firms, Holland gained comprehensive knowledge of Cole's most important trade secrets and confidential information, namely, insight into the identity and location of the financial advisors who are most interested in, and effective at, investing their clients' funds in alternative investments.   Holland obviously cannot "unlearn" that vital information, and – whether consciously or unconsciously – he will inevitably use that information in his new role leading Carlyle's efforts to "build" the "distribution channel" for its alternative investments, "identify [and] cultivate relationships with" key financial

advisory firms and individual financial advisors, and "secure investment capital commitments through wire houses, independent financial advisors, regional financial advisors, and other similar organizations that represent current and prospective accredited high net worth investors and non-accredited mass affluent investors for the purpose of funding investments made or proposed to be made by Carlyle investment products…." See Exhibit D (Appendix A thereto).

45.     ARCP will also be irreparably harmed because, in his new position, Holland will be drawing upon the goodwill he developed with financial advisory firms and independent financial advisors – at enormous expense to Cole (ARCP's predecessor-in-interest) – during the three-plus years that he served as a key "face" of the Cole franchise, which ARCP continues to operate under the Cole name.  He will be using that goodwill, however, for the benefit of Carlyle, not ARCP, in an effort to attract investment in Carlyle's alternative investments.

46.     Because this matter arises out of contract, ARCP is entitled to an award of attorneys' fees pursuant to the terms of the contracts with Holland, A.R.S. § 12-341.01, or other applicable law.

## COUNT I

### *(Breach of Contract Against Holland)*

47.     Plaintiff ARCP repeats and realleges the facts alleged in ¶¶ 1 - 46, above, as if fully set forth herein.

48.     The Employment Agreement and the Consulting/Covenants Agreements are binding and enforceable agreements.

49.     Cole, and ARCP as its successor-in-interest, have complied fully with all material terms of the Employment Agreement.

50.     ARCP has complied fully with all of its material obligations under the Consulting/Covenants Agreement.

3601438.1                                             13

51.     Through his employment with Carlyle, Holland has breached the Non-disclosure and Non-solicitation covenants contained in the Employment Agreement and the Consulting/Covenants Agreement.

52.     ARCP has suffered material economic harm, as well as irreparable injury, due to Holland's breaches of the two agreements.

## COUNT II

### *(Tortious Interference With Contractual Relations Against Carlyle)*

53.     Plaintiff ARCP repeats and realleges the facts alleged in ¶¶ 1 - 52, above, as if fully set forth herein.

54.     ARCP and Holland are parties to the Employment Agreement and the Consulting/Covenants Agreement, which are binding and enforceable agreements.

55.     Carlyle knows of Holland's contractual obligations under the Employment Agreement and the Consulting/Covenants Agreement.

56.     Carlyle has intentionally, and improperly, interfered with ARCP's rights under the Employment Agreement and the Consulting/Covenants Agreement, and, through its hiring and employment of Holland, has caused him to breach the Agreements.

57.     ARCP has suffered material economic harm, as well as irreparable injury, due to Carlyle's tortious interference.

## COUNT III

### *(Fraud in the Inducement Against Holland)*

58.     Plaintiff ARCP repeats and realleges the facts alleged in ¶¶ 1 - 57, above, as if fully set forth herein.

59.     When Cole agreed to be acquired by ARCP in October of 2013, in connection with the merger, Holland was entitled to, and did receive, shares of ARCP common stock with a value of $1,711,907.35.

60.     Shortly before the February 7, 2014 closing of the acquisition, Holland falsely informed ARCP that he had decided that, rather than join ARCP as expected, he

1    wanted to "take time off."  He also falsely represented that he had no plans to join another

2    company.

3         61.    Under the Employment Agreement, if Holland was "terminated without

4    cause" within 24 months of a change of control of Cole, he would be entitled to

5    $5,411,947 in change of control severance payments.  At Holland's request, and in

6    reasonable reliance upon his intentional misrepresentations that he wanted to take time off

7    and would not be working for another company for the foreseeable future, ARCP agreed

8    to treat his departure as a post-acquisition "termination without cause," and to pay him –

9    and did in fact pay him – the multi-million dollar severance payment, along with another

10   $1.7 million in ARCP stock.  Holland, as part of this resolution, agreed to serve as a part-

11   time consultant for ARCP for six months for $100,000, and to agree to additional

12   restrictive covenants.

13        62.    Through his employment with Carlyle, Holland has breached the non-

14   disclosure

15   and non-solicitation covenants contained in the Consulting/Covenants Agreement.

16        63.    Accordingly, ARCP seeks rescission of the $7.1 million in compensation

17   paid to Holland in connection with his fraudulently induced "termination without cause."

18                              **PRAYER FOR RELIEF**

19        *WHEREFORE,* Plaintiff ARCP respectfully requests that this Court

20        (a) Find in ARCP's favor on Count I against Holland and Count II against

21             Carlyle;

22        (b) Preliminarily and permanently enjoin Holland from:

23             (i)    using or disclosing ARCP's Confidential Information (as defined in the

24                    Employment and Consulting/Covenants Agreements);

25             (ii)   directly or indirectly soliciting any investors in ARCP or any of the

26                    funds it manages (collectively, the "Funds"), including Cole Credit

27                    Property Trust, Inc.; Cole Credit Property Trust IV, Inc.; Cole Credit

28                    Property Trust V, Inc.; Cole Corporate Income Trust, Inc.; Cole Office

3601438.1                                    15

& Industrial REIT (CCIT II), Inc.; and Cole Real Estate Income Strategy (Daily NAV), Inc.; and

(iii)    directly or indirectly soliciting any financial advisory firms, and individual financial advisors whose clients are investors in ARCP or any of the Funds or any other financial advisors, wire houses or similar organizations through which ARCP or the Funds raised capital, or with which ARCP sought to develop a relationship prior to the end of Holland's consultancy with ARCP until August 5, 2015;

(c) Preliminarily and permanently enjoin Carlyle from further interfering with ARCP's rights under the Employment Agreement and the Consulting/Covenants Agreement;

(d) Rescind the $7.1 million in severance payments and stock grants ARCP made to Holland based on his false representations, through which he fraudulently induced ARCP to treat his departure from ARCP as "termination without cause";

(e) Award ARCP damages in an amount to be determined at trial, plus pre- and post-judgment interest;

(f) Award ARCP its reasonable costs and attorneys' fees; and

(g) Grant ARCP all other relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

1

DATED this 1st day of April, 2014.

2

JONES, SKELTON & HOCHULI, P.L.C.

3

4

By s/Charles M. Callahan

5

Robert R. Berk
Charles M. Callahan

6

2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Attorneys for Plaintiff ARCP

7

OF COUNSEL

8

9

Kevin J. O'Connor
Christopher T. Hynes
HINCKLEY, ALLEN & SNYDER LLP

10

28 State Street
Boston, MA  02109

11

12

**CERTIFICATE OF SERVICE**

13

I hereby certify that on this 1st day of April, 2014, I caused the foregoing

14

document to be filed electronically with the Clerk of Court through the CM/ECF System

15

for filing; and served on counsel of record via the Court's CM/ECF system.

16

17

s/Kadie G. Lewis

18

19

20

21

22

23

24

25

26

27

28

3601438.1

17