Ronda R. Fisk, 022100
Kristin L. Windtberg, 024804
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
rfisk@omlaw.com
kwindtberg@omlaw.com

Robert A. Van Kirk (pending *pro hac vice*)
C. Bryan Wilson (pending *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5163
rvankirk@wc.com
bwilson@wc.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| American Realty Capital Properties, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Jeffrey C. Holland; and The Carlyle Group, LP, <br><br> Defendants. | Case No. CV-14-00673-PHX-DGC <br><br> **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S *AMENDED* APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ........................................................................................... 1

    A. Jeffrey Holland and His Work for Cole ............................................. 1

    B. Carlyle ................................................................................................ 3

    C. "Alternative Investments" .................................................................. 3

    D. Mr. Holland's Known Departure To Move to New York ................. 4

    E. ARCP's Demand Letters Precede an *Ex Parte* TRO Application .......... 5

II. ARGUMENT ................................................................................................ 6

    A. ARCP Is Unlikely To Succeed on the Merits ...................................... 6

        1. ARCP Has Not Demonstrated Any Breach of the Contracts ................................................................................... 6

        2. ARCP Is Unlikely To Meet Its Burden of Showing that the Non-Solicitation and Non-Disclosure Provisions Are Enforceable ................................................................................ 6

            (a) The Non-Solicitation Provision Unreasonably Limits the Range of Mr. Holland's Activities ................. 8

            (b) The Non-Solicitation Provision's Limitless Geographic Scope Is Unreasonable ............................... 10

            (c) The Non-Solicitation Provision is Unreasonable in Duration ................................................................... 10

            (d) The Non-Disclosure Provision, as Interpreted by ARCP, Is Unreasonably Overbroad ............................. 11

        3. ARCP Is Unlikely To Prevail on the Tortious Interference Claim ............................................................................................ 12

    B. ARCP Has Not Shown Irreparable Harm .......................................... 14

    C. The Equities Are in Defendants' Favor ............................................. 15

III. JURISDICTIONAL CONCERNS ............................................................... 16

IV. CONCLUSION ........................................................................................... 17

Without *any* evidence that Defendant Jeffrey C. Holland ("Holland") has solicited a single client of his former employer, and without alleging any concrete harm, much less irreparable harm, Plaintiff American Realty Capital Properties, Inc. ("ARCP") asks this Court to enter a temporary restraining order against Defendants based on the sweeping assertion that all financial products, no matter how different, compete with one another.

ARCP occupies a niche market in the Real Estate Investment Trust ("REIT") industry. The Carlyle Group, L.P. ("Carlyle"), in contrast, is a global private equity firm that does not offer REIT shares and thus does not compete with ARCP. At Carlyle, Mr. Holland will market entirely different investment products than the ones offered by ARCP's predecessor, Cole Real Estate Investments, Inc. ("Cole"), and he is doing so from New York rather than Phoenix. Perhaps for that reason, ARCP has *not* alleged that Mr. Holland has violated the non-competition provisions in his agreements with Cole and ARCP. Instead, ARCP focuses solely on the client non-solicitation and non-disclosure provisions in Mr. Holland's agreements. Notably, ARCP does not argue that Mr. Holland has breached either of these provisions; it simply suggests that he *might* breach these agreements at some point in the future if allowed to continue his Carlyle employment. In any event, the provisions are overbroad and unenforceable, at least as interpreted in the manner proposed by ARCP.

This case presents a classic example of an employer improperly attempting to enforce post-employment restrictive covenants to restrain trade and preclude a former employee from pursuing a similar, though substantially different, position after termination of employment, rather than lawfully protecting the employer's legitimate business interests. Accordingly, the Court should deny ARCP's Amended Temporary Restraining Order Application (DE 10) ("App.").

I.     BACKGROUND

   A.     **Jeffrey Holland and His Work for Cole**

As set forth in the attached Declaration, Jeffrey Holland is a Harvard Law School

graduate with more than fifteen years of experience in the financial services industry. Decl. of Jeffrey C. Holland, attached hereto as **Exhibit 1** ("Holland Decl.") ¶¶ 5-6. For approximately three of those years, from December 2010 to February 5, 2014, he worked at Cole Real Estate Investments, Inc. ("Cole"). *Id.* ¶ 30. Like its successor-in-interest, ARCP, Cole was a REIT. *Id.* ¶ 36.

REITs sell shares like stock, but rather than investing in a company, shareholders invest in real estate. *Id.* ¶ 21. There are many different types of REITs. Firms that own or operate REITs often specialize in discrete types of real estate such as commercial, industrial, or multi-family residential properties. The REIT market makes up about three percent of the overall assets under management by financial advisors. *Id.* ¶ 24. Some commercial REITs, like Cole and ARCP, invest in a further subset called "net leases." *Id.* ¶ 25. A net lease requires the tenant to pay for all insurance, maintenance, and taxes. *Id.*

Cole marketed its net lease commercial REITs to independent financial advisors who focus on lower net-worth individuals, rather than large wirehouses like Wells Fargo and UBS, who focus on high net worth individuals. *Id.* ¶ 27. Of the more than 500,000 financial advisors in the United States, Cole did business with less than three percent of them. *Id.* ¶ 28.

As President and Chief Operating Officer ("COO") of Cole, Mr. Holland played virtually no personal role in soliciting clients. Instead, he oversaw the individuals who performed that function. *Id.* ¶ 33. Mr. Holland oversaw over 250 employees, approximately half of whom had responsibility for sales and relationship management. Given Mr. Holland's managerial responsibilities, he had only limited interactions with the financial advisory firms with which Cole did business (and even less interaction with those firms' thousands of individual advisors).[1] *Id.* ¶ 34.

---

[1]   ARCP's current president, David Kay, claims to know about Mr. Holland's "duties that Holland performed at Cole in his positions as EVP, President and COO." Affidavit of David S. Kay ("Kay Aff.") (DE 10-1) ¶ 37. But Mr. Kay joined ARCP in December 2013 and has no personal knowledge of Mr. Holland's job responsibilities. *See* Fed. R. Evid. 602.

2

**B.     Carlyle**

Carlyle is not a competitor of ARCP. *Id.* ¶ 49. Carlyle offers no net lease REIT investment products. *Id.* Indeed, Carlyle does not market REIT shares to any of its investors. *Id.* The Carlyle Group is a global alternative asset manager with, as of December 31, 2013, more than $189 billion in assets under management across 118 funds and 106 fund-of-funds vehicles. *Id.* Although Carlyle has a "real assets" business segment, Mr. Holland has no current involvement with it. *Id.* ¶ 52.

Unlike Cole and ARCP's offerings, Carlyle's retail products are designed for high net worth individuals. *Id.* ¶ 53. These products are non-registered, meaning they can be sold only to "qualified purchasers." *Id.* "Qualified purchaser[s]," by statute, are a limited subset of the investing public who, among other things, must own not less than $5,000,000 in investments. *See* 15 U.S.C. § 80a-2(a)(51)(A). In short, Carlyle pursues different types of investors than ARCP and offers those investors different types of investments. Thus, there is essentially no overlap between Cole/ARCP's customer base and Carlyle's. Carlyle hopes to develop additional retail offerings, but the focus is likely to remain primarily on high net worth individuals and will not be in the REIT space. Holland Decl. ¶ 53.

**C.     "Alternative Investments"**

As ARCP's President David Kay concedes, the world of "alternative investments" is diverse and covers a wide array of investment options. *See* Affidavit of David. S. Kay ("Kay Aff.") (DE 10-1) ¶ 10. ARCP does not, and cannot, claim that every alternative investment product competes with all others. Indeed, an investor interested in a REIT would not regard that investment as interchangeable with a private equity investment in, for example, corporate buy-outs. At Carlyle, Mr. Holland is responsible for developing new retail-oriented products and marketing strategies for Carlyle's private equity investments, including vehicles that invest in corporate bonds or term loans, and diversified funds-of-funds and hedge fund-of-funds investments. Holland Decl. ¶ 51. These investments bear no resemblance to net lease REITs. *See id.*

3

¶ 55.

### D.     Mr. Holland's Known Departure To Move to New York

When ARCP entered into an agreement to purchase Cole, Mr. Holland was not asked to stay on in his role as President and Chief Operating Officer.  To the contrary, shortly after the merger agreement, ARCP immediately began hiring new staff to manage Cole after the acquisition.  *Id.* ¶ 40.  In short order, ARCP hired someone else to fill Mr. Holland's role as COO and it hired David Kay to fill his role as President.  *Id*.  Mr. Holland was not offered a retention agreement and his continued service was not a condition of closing.  *Id.*

Nearly two months after the merger was announced, in December 2013, ARCP first began substantive discussions about Mr. Holland's future.  *Id.* ¶ 41.  Mr. Kay suggested that Mr. Holland could continue with ARCP after the acquisition, but would keep only about half of his responsibilities.  *Id.*  If Mr. Holland were to stay on in any capacity, it would be in a reduced role, thereby triggering his right to resign for "good reason" under his Employment Agreement.  *See* Exhibits to Kay Aff. ("Kay Aff. Ex.") (DE 10-2), Ex. B § 3(c).  Because ARCP could not offer Mr. Holland the same position he held at Cole, he informed Mr. Kay and others of his intention to resign upon completion of the merger.  Holland Decl. ¶ 42.  He also informed ARCP that he did not intend to remain in the net lease REIT business.  *Id*.

Whether Mr. Holland was terminated "without cause" or resigned for "good reason" made no difference to the economics of his departure from Cole under the terms of his Employment Agreement.  *Id.* ¶¶ 42-43; *see also* Kay Aff. Ex. B §§ 3-4.  He nevertheless agreed to make himself available to ARCP's executives during the transition period for a maximum of ten hours per week.  *Id.* ¶ 44.  The Consulting Agreement (Kay Aff. Ex. C) memorializing this arrangement included the same non-compete and non-solicitation provisions as his Employment Agreement (Kay Aff. Ex. B), except that it extended his non-compete to from twelve months to twenty-four.  Holland Decl. ¶ 44.  The non-compete precluded Mr. Holland from working for a

4

competitor in the net lease REIT space, but did not otherwise prohibit him from working in non-competitive businesses. *Id.* Because he did not intend to continue to work in the net lease REIT investment space, he had no concerns about agreeing to that provision. *Id.* Indeed, nothing in the Consulting Agreement reflects an expectation that Mr. Holland would remain with ARCP. Nor does the Consulting Agreement require Mr. Holland to refrain from working elsewhere during or after its duration.

Two days before the acquisition closed, on February 5, 2014, ARCP and Mr. Holland executed a Separation and Release Agreement and a Consulting Agreement that governed his separation and consulting relationship. *Id*. ¶ 45. The Consulting Agreement, by its terms, was terminable by either party at will. *Id.*; *see also* Kay Aff. Ex. C. at 1.

On March 10, 2014, Mr. Holland informed Mr. Kay via email of his decision to terminate the Consulting Agreement. Holland Decl. ¶ 46. In that same communication, he disclosed his decision to return to New York to take a position in investment management. *Id. ¶* 47. He also made clear his intention not to market or sell REIT products in his new position. *Id.* Although he was entitled, under the terms of the Consulting Agreement, to be paid a pro-rata portion of his consulting fee, he volunteered to forego that compensation. *Id.*

On March 17, 2014, Mr. Holland was hired by a Carlyle affiliate. *Id.* ¶ 48. He executed an employment agreement in which he represented that he would adhere to his restrictive covenants and any confidentiality agreements with his previous employers. *Id.* To date, he has done so: Mr. Holland has not solicited any of Cole or ARCP's clients, and has no intent to solicit any such clients about net lease REIT investments. *Id.* ¶ 4.

**E.   ARCP's Demand Letters Precede an *Ex Parte* TRO Application**

After ARCP asked Carlyle whether Mr. Holland would be joining the company, Carlyle's human resources department responded affirmatively, and included a generic description of Mr. Holland's duties with the correspondence. Although it was under no

5

obligation to do so, Carlyle assured ARCP: "We do not expect that Mr. Holland will provide services with respect to either our Corporate Private Equity or our Real Assets business segments." Kay Aff. Ex. D.

On March 24, 2014, ARCP responded with a letter claiming that Mr. Holland's mere employment by Carlyle would "result in a direct breach" of the Agreements. Kay Aff. Ex. E at 1. It sent a similar letter to Mr. Holland the next day. Affidavit of Kevin J. O'Connor ("O'Connor Aff.") (DE 10-3) and exhibit thereto (DE 10-4) Ex. A.

Days later—and before Carlyle or Mr. Holland could respond to the letters—ARCP filed this lawsuit. In an amended filing on April 2, 2014, ARCP asked the Court to enter a TRO against both Defendants on an *ex parte* basis and without notice. DE 10. In that Application, ARCP's counsel failed to identify, *inter alia*, any efforts to contact either Defendant to permit them to appear and defend. *See* O'Connor Aff. ¶¶ 9-11; *cf.* Fed. R. Civ. P. 65(b)(1). The Court rejected that effort. DE 12.

## II.  ARGUMENT

### A.  ARCP Is Unlikely To Succeed on the Merits.

#### 1.  ARCP Has Not Demonstrated Any Breach of the Contracts.

The Court need not even consider whether the provisions at issue are enforceable—a highly dubious proposition—to deny ARCP's application. ARCP's Application and affidavits do not identify *any* actual or threatened solicitation of its clients, or use of its confidential information (however poorly defined), by Mr. Holland. Simply put, even under the overbroad restrictive covenants, Mr. Holland has not and will not breach them. Mr. Holland's Declaration makes clear that (1) he has not solicited any clients at all for Carlyle; and (2) if he ever did it would not be for the investment products ARCP sells. *See* Holland Decl. ¶ 4. Without any proof of breach—or even a likely breach—ARCP is unlikely to succeed on the merits.

#### 2.  ARCP Is Unlikely To Meet Its Burden of Showing that the Non-Solicitation and Non-Disclosure Provisions Are Enforceable.

ARCP also is likewise unlikely to succeed on the merits because the restrictive

6

covenants at issue are unenforceable.  Courts closely scrutinize restrictive covenants to ensure they do not unreasonably restrain trade.  *See, e.g.*, *Unisource Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1063 (D. Ariz. 2013) ("Arizona law does not look kindly upon restrictive covenants."); *Severn Mktg. Assocs., Inc. v. Doolin*, No. CCB-09-3295, 2010 WL 3834994, at *3 (D. Md. Sept. 29, 2010).[2]  "Of the various forms of restrictive covenants," moreover, "those that 'tend to prevent an employee from pursuing a similar vocation after termination of employment' are particularly disfavored."  *Swope*, 964 F. Supp. 2d at 1063 (citation omitted).  Provisions purporting to restrict former employees from similar work are thus "strictly construed against the employer."  *Orca Commc'ns Unlimited, LLC v. Noder*, 233 Ariz. 411, 314 P.3d 89, 94 (Ct. App. 2013); *cf. Mansell v. Toys R Us, Inc.*, 673 F. Supp. 2d 407, 415 (D. Md. 2009).  ARCP must show that the restrictive covenants are "no greater than necessary to protect [ARCP's] legitimate interest."  *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 372, 982 P.2d 1277, 1286 (1999).

A restrictive covenant is unenforceable unless it is "reasonable with respect to its duration, its geographic scope, and the range of employee's activities affected."  *Swope*, 964 F. Supp. 2d at 1064.  To be reasonable, a restrictive covenant must be no broader than necessary to protect the former employer's business.  *Id.* at 1063; *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 437-38 (4th Cir. 2004) (per curiam) (applying Maryland law).

ARCP characterizes the non-solicitation provision as prohibiting Mr. Holland from soliciting, for twelve months after terminating his employment, "any investors in Cole or ARCP funds or the financial advisors of those investors."  App. at 3.  The text of

---

[2]   Maryland law governs the Employment Agreement.  *See* Ex. B § 14(a).  Arizona law governs the Consulting Agreement.  *See* Ex. C § 6.  Under either state's law, the restrictive covenants are unlikely to be deemed enforceable.  To the extent that Maryland law would sustain the covenants on a basis that Arizona law does not recognize, Arizona law controls.  *See Pathway Med. Techs., Inc. v. Nelson*, No. CV11-0857-PHX-DGC, 2011 WL 4543928, at *4 (D. Ariz. Sept. 30, 2011) (denying TRO application in part on the grounds that a Washington choice-of-law provision likely would be held unenforceable because Washington approves of broad non-compete provisions and allows courts to rewrite such provisions).

7

the lengthy provision purports to keep Mr. Holland not only from soliciting investors with whom he had "dealings, contact or involvement" (Kay Aff. Ex. B § 8(c)(ii) & C(2)(ii)), but also any other Cole or ARCP client, even if they have never met (Kay Aff. Ex. B § 8(c)(iii) & C(2)(iii)), and even as to completely unrelated products.  With few exceptions, the non-disclosure provision, by its terms, prohibits Mr. Holland from disclosing a broad range of things, ranging from concrete materials like customer lists to abstract and ambiguous concepts like "tactics," "know-how," "discoveries," "ideas," and "procedures."  *See* Kay Aff. Exs. B § 7(a) & (d) & C § 1(a) & (d).  ARCP is unlikely to prove that either provision is enforceable as drafted.[3]

### (a) The Non-Solicitation Provision Unreasonably Limits the Range of Mr. Holland's Activities.

A restrictive covenant is unreasonably broad if it limits the former employee's activities more than necessary to protect the corporate goodwill he helped create.  *See Conrad*, 116 F. App'x at 437-38; *Swope*, 964 F. Supp. 2d at 1063-64.  Thus, "any restraint on an employee's activities 'must be limited to the particular specialty'" that the employee practiced for the former employer.  *Swope*, 964 F. Supp. 2d at 1064 (quoting *Farber*, 194 Ariz. at 371).  The non-solicitation provision as interpreted by ARCP fails this test in two respects:  (1) it prohibits Mr. Holland from marketing a different product to Cole/ARCP clients; and (2) it prohibits Mr. Holland from soliciting Cole/ARCP clients with whom he had minimal, or no, meaningful business relationship.  *See* Kay Aff. Exs. B § 8(c) & C § 2(c).

In *Nouveau Riche Corp. v. Tree*, the Court refused to issue a preliminary injunction based on restrictive covenants that prohibited former employees from

---

[3] The Agreements include provisions purporting to allow a court to re-write them if they are deemed unenforceable.  *See* Kay Aff. Exs. B § 8(d) & C § 2(d).  Although Arizona and Maryland courts will "'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions," they will not rewrite them.  *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 372, 982 P.2d 1277, 1286 (1999); *see Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 439 (4th Cir. 2004) (applying Maryland law).  This rule applies even if the contract has a reformation provision.  *See, e.g.*, *Varsity Gold, Inc. v. Porzio*, 202 Ariz. 355, 358 & n.2, 45 P.3d 352, 355 & n.2 (Ct. App. 2002) (refusing to apply reformation clause to render restrictive covenant enforceable).

8

1  "marketing or selling any product or service in competition with [the former employer]
2  rather than limiting the restriction to those products or services with which Defendants
3  were involved at [the former employer]." No. CV 08-1627-PHX-JAT, 2008 WL
4  5381513, at *8 (D. Ariz. Dec. 23, 2008). So, too, here, ARCP is attempting to prevent
5  Mr. Holland, from marketing anything at all from Carlyle, even if the investment
6  products are unrelated to the net lease REITs he marketed at Cole. That endeavor is
7  unlikely to succeed on the merits. *See id.*

8        The non-solicitation provision also purports to prevent Mr. Holland from
9  soliciting business from Cole and ARCP clients with whom he had no contact or
10 dealings while working for Cole. *See* Kay Aff. Exs. B § 8(c) & C § 2(c). A former
11 employer's protectable interest extends only to clients with whom the former employee
12 "formed a meaningful relationship." *Tree*, 2008 WL 5381513, at *5 (citing
13 *Olliver/Pilcher Ins., Inc. v. Daniels*, 148 Ariz. 530, 532, 715 P.2d 1218, 1220 (1986) (en
14 banc)); *see Holloway v. Faw, Casson & Co.*, 552 A.2d 1311, 1319-21 (Md. Ct. Spec.
15 App. 1989) (invalidating a non-solicitation agreement covering "*any* former clients of
16 the firm, regardless of whether [the employee] himself actually dealt with those clients
17 during his employment"), *rev'd in part on other grounds*, 572 A.2d 510 (Md. 1990).
18 When he worked for Cole as President and COO, Mr. Holland did not frequently interact
19 with clients and rarely formed meaningful, personal business relationships with any of
20 them. Instead he oversaw a large team that was responsible for fostering those
21 relationships. *See* Holland Decl. ¶ 34.

22       ARCP would lose no goodwill in the event that Mr. Holland solicited—even
23 unwittingly—a Cole or ARCP customer who Mr. Holland had never previously met.
24 Yet ARCP would consider that scenario a breach. For that reason as well, ARCP cannot
25 carry its burden of showing that the provision is enforceable. *See Pathway Med. Techs.*,
26 2011 WL 4543928, at *5 (holding that Arizona courts would not enforce provision
27 prohibiting former employee "from having contact even with customers with whom he
28 had no prior relationship").

9

### (b) The Non-Solicitation Provision's Limitless Geographic Scope Is Unreasonable.

ARCP is unlikely to carry its burden of proving that the restrictive covenants are enforceable because they have no geographic limitation. Unlike the non-competition provision, which ARCP does not claim has been breached and that at least pays lip service to geographic limits, the non-solicit provision contains no geographic limitations whatsoever. *See* Kay Aff. Ex. B § 8(a). Courts are unlikely to sustain this sort of worldwide ban on Mr. Holland's marketing activities.

In *Pathway Medical Technologies*, this Court explained that "Arizona courts do not enforce non-compete agreements with unlimited geographical reach." 2011 WL 4543928, at *5.[4] Yet ARCP's restrictive covenants are even more boundless than the ones at issue in that case, which were at least confined to the United States. *See id.*; *see also Karp v. Avella of Deer Valley Inc.*, CV13-1885 PHX DGC, 2013 WL 5435212, at *1 (D. Ariz. Sept. 30, 2013) (holding unenforceable a non-solicitation covenant without geographical limitation, in part because it applied to clients with whom former employee had no meaningful relationship).

### (c) The Non-Solicitation Provision is Unreasonable in Duration.

A restrictive covenant may persist no longer than necessary to put a new employee in place and allow him "a reasonable opportunity to demonstrate his effectiveness to the customers." *Tree*, 2008 WL 5381513, at *8 (internal quotation marks omitted); *see also Mansell*, 673 F. Supp. 2d at 417 n.8. "The apparent purpose of this principle is to prevent a skilled employee from leaving an employer and, based on his skill acquired from that employment, luring away the employer's clients or business . . . before the employer has had a chance to replace the employee with

---

[4] Two Maryland federal courts did enforce restrictive covenants lacking geographical limitations. *See Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 607 (D. Md. 2002); *Intelus Corp. v. Barton,* 7 F. Supp. 2d 635, 641-42 (D. Md. 1998), *arbrogated in part by MCS Servs., Inc. v. Jones*, No. WMN–10–1042, 2010 WL 3895380 (D. Md. Oct. 1, 2010). Unlike this case, however, the court relied on the fact that the employee was restricted merely from working for a small number of direct competitors. *Padco Advisors*, 179 F. Supp. 2d at 607 (two competitors); *Intelus,* 7 F. Supp. 2d. at 641-42 (ten competitors).

10

someone qualified to do the job." *Bryceland v. Northey*, 160 Ariz. 213, 217, 772 P.2d 36, 40 (Ct. App. 1989); *see Farber*, 194 Ariz. at 370, 902 P.2d at 1284.[5]

Mr. Holland rarely had direct client contact during his tenure at Cole, and his replacements were in place before he left. Holland Decl. ¶¶ 34, 40. There is no indication that his replacements will require a year to demonstrate their effectiveness. *Cf. Highway Techs., Inc. v. Porter*, No. CV-09-1305-PHX-DGC, 2009 WL 1835114, at *2-3 (D. Ariz. June 26, 2009) (former employee's personal relationships with clients left the former employer vulnerable to customer emigration, necessitating a grace period to fill the void).[6] Yet, ARCP demands full enforcement of the one-year duration—and more(!).[7] In *Tree*, this Court held that a restrictive covenant was "likely to be deemed unreasonable" because the former employee "ha[d] already been replaced" and "her replacement ha[d] become effective" for plaintiff. 2008 WL 5381513, at *8. The same conclusion is warranted here. *See id.*; *Zep, Inc. v. Brody Chem. Co.*, No. CV-09-0505-PHX-NVW, 2010 WL 1381896, at *5 (D. Ariz. Apr. 6, 2010) (non-solicitation covenant lasting twelve months is unenforceable given the replacement employees' industry experience).

### (d) The Non-Disclosure Provision, as Interpreted by ARCP, Is Unreasonably Overbroad.

ARCP does not allege that Mr. Holland took its customer list, customer database, or any other conceivably proprietary information. Instead, it contends that Mr. Holland's walk-around knowledge of ARCP's clients constitutes confidential

---

[5] ARCP's claim that "Maryland has consistently upheld two year limitations on employment with competitors," (App. at 11 (citation omitted)), is irrelevant. Carlyle and ARCP are not competitors—as conceded by the failure to allege a breach of Mr. Holland's non-compete.

[6] ARCP's other cases cited in support of the duration of the covenants are equally distinguishable. Two of the cases do not involve individual employment agreements. *See Snelling & Snelling, Inc. v. Dupay Enters., Inc.*, 125 Ariz. 362, 364-65, 609 P.2d 1062, 1064-65 (Ct. App. 1980) (franchise agreement, court upheld 3-year limitation on narrow, 35-mile franchise area and invalidated a broader geographic area); *Corporate Healthcare Fin., Inc. v. BCI Holdings Co.*, No. CCB-05-3391, 2006 WL 1997126, at *5 (D. Md. July 13, 2006) (contract between two business in a niche contractor-subcontractor relationship in which "it can sometimes take several years of interaction to gain a new customer").

[7] The proposed TRO that ARCP tendered to the Court asks for "temporary" enforcement of the provisions beyond their expiration date, to "August 15, 2015." DE 10-5 at 3.

11

information.  *See* App. at 13.  That position is untenable.

"[A]n alert salesperson is not required to undergo a prefrontal lobotomy" upon leaving an employer so as to avoid leveraging his experience in future endeavors.  *Amex Distrib. Co., v. Mascari*, 150 Ariz. 510, 517, 724 P.2d 596, 602-03 (Ct. App. 1986).  In *Mascari*, the court refused to enforce a confidentiality provision purporting to prevent a produce broker from using the "knowledge of particular customers" he accrued as a client-facing employee of the plaintiff.  *Id.*  The court held that the confidentiality agreement, which, as here, effectively "boil[ed] down to a noncompetition covenant," was unenforceable because of its duration.  *Id.* at 517, 724 P.2d at 603.  The court also noted, however, that it "doubt[ed]" that the former employee's use of customer information violated a protectable interest, reasoning that "customer information is not proprietary and its use not unlawful when the customers characteristically d[o] business with more than one source so that the customer [i]s known to the competition."  *Id.*, 724 P.2d at 603; *see Farber*, 194 Ariz. at 367, 982 P.2d at 1281 ("the restriction must do more than simply prohibit fair competition").

And so here.  ARCP's principal clients are publicly and widely known.  Holland Decl. ¶¶ 18-19.  On that basis, their identities are not "Confidential Information" even as defined by the Agreements.  *See* Kay Aff. Exs. B § 7(d) (exempting from the definition information that is in the public domain) & C § 1(d) (same).  Even if Mr. Holland knew through his work at ARCP about a particular customer's appetite for net lease REIT investments—an unlikely proposition which has not been established—that information would be of no competitive use to him at Carlyle, where he will be marketing different investments.  Whatever broad-based business acumen he developed in his time at ARCP cannot be restrained through the non-disclosure provision.  *See Swope*, 964 F. Supp. 2d at 1063 ("[A] covenant cannot be used to preclude a former employee from using at a new job the skills he developed while working for the employer.").

      **3.**    **ARCP Is Unlikely To Prevail on the Tortious Interference Claim**

To prevail on its tortious interference claim, ARCP will have to prove "(1)

12

existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 493, 38 P.3d 12, 31 (2002) (en banc). The sole argument ARCP puts forward to show its likelihood to succeed on the merits of this claim, however, is by reference to the letter ARCP sent to Carlyle on March 24, 2014—one week before it filed this lawsuit. *See* App. at 12.

As already shown above, ARCP is unlikely to prove the most basic elements of this claim: that Mr. Holland breached the contracts and that the contractual provisions at issue are enforceable. *See, e.g.*, *Modus LLC v. Encore Legal Solutions, Inc.*, No. CV-12-00699-PHX-JAT, 2013 WL 6628125, at *5 (D. Ariz. Dec. 17, 2013) ("The Non-Compete Agreement is facially unenforceable. Accordingly, there was no valid contractual relationship with which Modus could tort[io]usly interfere . . . .").

Even if ARCP could surmount those very high initial hurdles, however, ARCP is unlikely to show that Carlyle engaged in any "improper conduct." Notably, ARCP does not even argue that it can do so in its Application. Arizona courts consider several factors in assessing this element,[8] with the most important factors being "the nature of the actor's conduct and the actor's motive." *Wells Fargo Bank*, 201 Ariz. at 474, 38 P.3d at 32. Carlyle's employment agreement with Mr. Holland requires him to adhere to his restrictive covenants and any confidentiality agreements with his previous employers, including ARCP—and he has done so. Carlyle has not evinced any improper motive against ARCP in hiring Mr. Holland: Carlyle does not compete with ARCP or offer net lease REITs to its investors. Holland Decl. ¶ 49. When ARCP asked if Carlyle

---

[8] The complete list of factors is: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Wells Fargo Bank*, 201 Ariz. at 494, 38 P.3d at 32 (internal quotation marks omitted).

13

1  had hired Mr. Holland, Carlyle candidly replied that it had done so.  *See* Kay Aff. Ex. D.
2  "[A] reasonable, good faith belief in the legality of the conduct weighs against a finding
3  of 'improper' conduct."  *Emp'rs Reinsurance Corp. v. GMAC Ins.*, 308 F. Supp. 2d
4  1010, 1016 (D. Ariz. 2004) (applying Arizona law).  The only record evidence on this
5  issue confirms that Carlyle exercised a good faith belief in the legality of its conduct
6  when it hired Mr. Holland.  ARCP is unlikely to prove that Carlyle behaved improperly.

### B. ARCP Has Not Shown Irreparable Harm.

8  ARCP identifies no harm that it has actually suffered.  There is no claim that any
9  of its clients have heard from Mr. Holland or even suspiciously announced the intention
10 of moving business from ARCP to Carlyle.  ARCP's speculative and vague concern that
11 somehow, some day, it might be injured is inadequate.  *See Johansen v. Ryan*, No. CV
12 10-1912-PHX-JAT, 2011 WL 3555720, at *3 (D. Ariz. Aug. 11, 2011) ("Mere
13 '[s]peculative injury does not constitute irreparable injury sufficient to warrant granting
14 a preliminary injunction.'"  (alteration in original) (citation omitted)).

15 The best ARCP can muster is to claim that Mr. Holland will "inevitably" use
16 ARCP's "trade secrets and confidential information" (App. at 13) in his new role.  But
17 there is nothing inevitable about it:  Mr. Holland is pursuing a different business, with
18 different target investors, in a different place.  If he ever does contact independent
19 financial advisors, it will not be for the purpose of selling net lease REIT products.
20 ARCP's unsubstantiated fear of a potential breach is insufficient to warrant injunctive
21 relief against Defendants.  *JDA Software, Inc. v. Bissett*, No. CV-07-720-PHX-FJM,
22 2007 WL 1576004, at *1 (D. Ariz. May 30, 2007) (declining to grant preliminary
23 injunction because the former employer "does not claim any loss of clients and does not
24 claim that [the employee] actually revealed confidences"), *aff'd*, 282 F. App'x 532 (9th
25 Cir. 2008).  Moreover, Mr. Holland's familiarity with publicly known independent
26 financial advisors is not confidential information.  *See* Kay Aff. Exs. B § 7(d) & C

14

§ 1(d).[9]

Hoping to elide the showing of irreparable injury altogether, ARCP argues that "once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected." App. at 13 (citing *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs*, 164 Ariz. 54, 59, 790 P.2d 752, 757 (Ct. App. 1989), *overruled on other grounds*, *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277 (1999)). But the case ARCP cites for this provision, and the others Defendants have located, apply that presumption only *after* a former employee has already violated his restrictive covenants or made clear his intention to do so. *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (granting preliminary injunction where former employees "have accepted eleven customers with assets of approximately $18 million and will continue to accept their business unless enjoined from doing so"); *Highway Techs.*, 2009 WL 1835114, at *2 (granting a TRO where former employees "acknowledge[d] that [the employer was] vulnerable to losing customers to them absent enforcement of the restrictive covenants"); *Wachovia Ins. Servs., Inc. v. Hinds*, No. WDQ-07-2114, 2007 WL 6624661, at *3 (D. Md. Aug. 30, 2007) (granting a preliminary injunction because former employee's solicitation of four former clients suggested that "others may follow"). Here, the opposite is true: ARCP has not pointed to a single client that Mr. Holland has solicited, and Mr. Holland has testified unequivocally that he has made no such solicitation. Holland Decl. ¶ 4.

### C. The Equities Are in Defendants' Favor.

The balance of equities is one-sided in Defendants' favor. ARCP has not suffered

---

[9] In a footnote, ARCP invokes a recitation of irreparable harm in the Agreements. *See* App. at 14 n.4 (citing Kay Aff. Exs. B § 8(d) & C § 2(d)). Courts appropriately ignore such efforts to dictate a legal conclusion only a court can make. *See, e.g.*, *Farber*, 194 Ariz. at 365-66, 982 P.2d at 1279-80 (restrictive covenant unreasonable notwithstanding employee's acknowledgment and agreement that the covenants "are minimum and reasonable in scope and are necessary to protect the legitimate interest of the Employer"); *TBB Global Logistics, Inc. v. ICAT Logistics, Inc.*, No. WDQ-13-1428, 2013 WL 2302677, at *1, *6 (D. Md. May 23, 2013) (denying TRO application notwithstanding provision purporting to entitle the employer to obtain an injunction restraining any breach or threatened breach); *Tree*, 2008 WL 5381513, at *2, *10 (same).

15

any irreparable harm in this case, nor is it likely to do so in the future.  On the other hand, Mr. Holland is now working in New York and were he barred from working, Carlyle would not receive the benefit of Mr. Holland's professional skills and innovation in pursuing investments totally unrelated to his work at ARCP.  Mr. Holland would needlessly be prohibited from pursuing his chosen profession.  *See Carboline Co. v. Lebeck*, 990 F. Supp. 762, 768 (E.D. Mo. 1997) (denying a preliminary injunction in part because it "would cause significant harm to Lebeck by limiting him in the practice of his profession.").

The status quo has not changed, nor is it threatened by Mr. Holland's continued employment at Carlyle.  *See Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, No. 09 civ. 10343 (WHP), 2010 WL 185656, at *4 (S.D.N.Y. Jan. 12, 2010) (if movant's "losses have been suffered even though the Individual Defendants are not yet competing against them," there is no basis to enter "an injunction to maintain the status quo of non-competition").  Mr. Holland is neither soliciting ARCP's clients nor using ACRP's confidential information.  Neither he nor Carlyle should be burdened with an injunction, especially given ARCP's expansive and unreasonable reading of the restrictive covenants.[10]

### III. JURISDICTIONAL CONCERNS

Defendants are constrained to point out that ARCP's unusual decision to sue Carlyle, which is not the corporate entity that employs Mr. Holland or an indispensible party, puts the Court's diversity jurisdiction in doubt.  Federal courts have original jurisdiction over actions in which the amount in controversy exceeds $75,000 and is between "citizens of different States."  28 U.S.C. § 1332(a)(1).  The party asserting federal jurisdiction must prove these requirements.  *Grand Canyon Skywalk Dev., LLC*

---

[10] In the unlikely event that the Court enters an injunction, it should impose a substantial bond on ARCP.  *See* Fed. R. Civ. P. 65(c).  Although the Agreements purport to waive a bond (Kay Aff. Exs. B § 8(d) & C § 2(d)), that does not negate Rule 65(c)'s requirement that the Court may enter a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained" by an erroneous injunction.  And in any event, Carlyle is not a signatory to that contract and has not agreed to forego a bond.

16

*v. Hualapai Indian Tribe of Ariz.*, No. CV-13-08054-PCT-DGC, __ F. Supp. 2d __, 2013 WL 4478778, at *3 (D. Ariz. Aug. 20, 2013). For diversity purposes, a limited partnership is considered a citizen of every state in which its partners—including its limited partners—are citizens. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990); *Albano v. Shea Homes Ltd. P'ship*, Nos. CV-07-2359-PHX-SMM, CV-08-505-PHX-SMM, 2008 WL 2941279, at *2 (D. Ariz. July 25, 2008).

Carlyle is a limited partnership. But ARCP does not allege anything about the citizenship of Carlyle's partners. Given that Carlyle is publicly traded and has thousands of limited partners around the country, at least some of those partners likely are citizens of either Maryland or New York, where ARCP is itself considered a citizen. *See* Compl. ¶ 1. Given the limited time provided to respond to the Application, Carlyle has been unable to identify particular examples of limited partners in these states. But Carlyle's (needless) presence as a defendant likely destroys diversity in this case. ARCP's error can be cured by dismissing Carlyle. *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 572-73 (2004) (diversity jurisdiction may be maintained by dismissal of a dispensable non-diverse party); Fed. R. Civ. P. 21. The jurisdictional cloud ARCP has placed on the case is yet another reason to deny ARCP's Application.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny ARCP's Application.[11]

---

[11] The Employment Agreement contains a mandatory arbitration provision. *See* Ex. B § 14(a). There is a narrow exception allowing, *inter alia*, applications for injunctive relief. *Id.* § 14(a)(iii). ARCP exceeded that exception, and thereby waived its right to compel arbitration, by (1) asserting a separate cause of action against Mr. Holland (Count III) for which no injunctive relief is sought and (2) demanding a jury trial. Defendants are responding to the TRO application pursuant to the narrow exception to otherwise mandatory arbitration. Defendants reserve, and do not waive, all of their rights in connection with the arbitration provision.

17

Respectfully submitted this 7th day of April, 2014.

                          OSBORN MALEDON, P.A.

                          By: s/ Ronda R. Fisk
                                Ronda R. Fisk
                                Kristin L. Windtberg
                                2929 N. Central Avenue, Suite 2100
                                Phoenix, Arizona  85012-2793

                          WILLIAMS & CONNOLLY LLP
                                Robert A. Van Kirk (pending *PHV*)
                                C. Bryan Wilson (pending *PHV*)
                                725 Twelfth Street, N.W.
                                Washington, DC  20005

                          Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

     I hereby certify that on April 7, 2014, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

     Upon receipt of the Notice of Electronic Filing, a copy of the attached document will be mailed to the Honorable David G. Campbell.

s/   Jessica A. Lopez
5415899